et al, 20-4222. Ms. Powell? Hold on just a minute. Please proceed. Good morning, Your Honors. May it please the Court, my name is Andrew Glass of Carson and Tallberg. I represent the defendant's appellants, Captain Robert Cipolla, Officer Robert Smaldone, and Officer Michael Tyler. The District Court's denial of qualified immunity should be reversed because Officer Smaldone had probable cause or arguable probable cause to charge plaintiff with a count of assault on a public safety officer and criminal attempt of assault on a public safety officer based on the sworn written statement of EMT Daniel Monahan. Additionally, based on the exigent circumstances, the defendant's brief de minimis entry into plaintiff's residence and the limited force used to detain her was objectively reasonable and did not violate clearly established law as they ensured the safety of plaintiff's minor child. As the District Court determined, the defendant's belief that plaintiff presented a danger to herself and or her children was reasonable based on plaintiff's erratic and hostile behavior and the smell of alcohol on her person. With respect to the malicious prosecution claim, while the plaintiff disputes the contents of EMT Monahan's sworn statement, she does not dispute that such a statement was provided to Officer Smaldone. Police officers may rely on the statements of a putative victim or witness to determine probable cause for an arrest unless that officer is presented with reason to doubt the witness's veracity. But for plaintiff's claim that she did not kick EMT Monahan, there is no indication that Officer Smaldone had any reason to dispute Mr. Monahan's statement. In fact — Aren't we in — I mean, at this point, though, you have to accept the allegation — the evidence as presented by the plaintiff here, correct? Yes, we do, and we have, Your Honor. Okay. So I guess — I mean, I have a couple of thoughts, but I mean, I'll take you back to the question of exigent circumstances. Yep. Based on, you know, accepting the plaintiff's facts, what were the exigent circumstances for a warrantless entry when she's being arrested for misusing 911, not for anything violent, not for anything that calls into question safety? And the mere fact that there is a child in the house, does that mean that that creates exigent circumstances? Well, Your Honor, arriving at the scene, the purpose was to investigate the misuse of the 911 system and plaintiff's repeated calls that the officers returned to her house. Upon arriving, the district court listed a litany of factors that went to the reasonableness of the officer's determination that plaintiff presented a danger to herself or others, including the children. Namely, the 12 calls she had made to the police department, her profanity during those calls, her hostility and erratic behavior upon the officer's arrival at the house, and the smell of alcohol that the officers reported almost immediately smelling on her person. But that was after she — wasn't that after she left the house? The smell of alcohol was immediately after she was walking away was when an officer first mentioned it. But the fact that it was mentioned 30 seconds later doesn't mean that the officers didn't perceive the alcohol at the time they arrived. So someone who is upset and being approached by the police in their home, that's an exigent circumstance to a reasonable officer to think, oh, this is an emergency. I can go in here. We're going to talk to her about these 911 calls, and she's being rude to us. That's an exigent circumstance. That's going to justify a warrantless entry into her home. Well, Your Honor, the circumstances changed. Again, the purpose of appearing at the house was plaintiff made multiple calls. During those calls, she demanded that officers come to her house for a second time that day. So they went both at her request, given her excited state over the phone, and — I mean, she wanted the police there, and she was being — there was nothing to suggest harm to her or danger or something where these officers felt like, we have to get into this house right now. Well, Your Honor, again, it was her excited state, the profanity, the hostility, and the erratic behavior immediately upon the officer's arrival on the scene. Profanity and — okay. Profanity and hostility to the police justifies a warrantless entry. After they — after she had demanded that they be there, then she was hostile and erratic towards them. They noticed the child is there, and that presents exigency to figure out what's going on and to ensure for the welfare of the child and ensure — Was there any testimony about anything suggesting any danger whatsoever to the child? There's just the child present, is that — There's the child present and the fact that the plaintiff is acting erratically and hostilely towards them, and immediately upon arrival at the threshold of the door, the child is there with the plaintiff who's acting in this manner, which, again, the court determined was reason to believe that the plaintiff presented a danger to herself or others, including the children. Can I just ask you — I'm sorry I'm taking a fair amount of your time. I just — on the question of excessive force, which I know you haven't raised yet, but I guess one thing I'm interested in is the fact that here the plaintiff suffered a concussion and fractured clavicle and that the nature of those injuries seems to suggest excessive force. I don't know if you're — I assume you're still pursuing that argument on appeal, if not — Yes, Your Honor. We will rely on our briefing for that. Again, saying that the allegation, even as plaintiff says, is that at the time they step in the house, they pull her out and she hits her shoulder and has the injury as a result of hitting the door frame. But again, if the exits and circumstances warrant the entry and the force, we would argue that under the circumstances, the force that was used was reasonable outset force, not briefing. Wait, wait, wait. Are you relying in connection with your excessive force argument on the existence of exits and circumstances? To the extent, Your Honor, that the force occurred as part of the process of insuring for the welfare of the child, and that's what warranted both the entry and detaining the plaintiff, the limited force that was used in order to effectuate that initial detention. Yes, Your Honor. Don't all these arguments rely on your client's version of the events as they occurred? No, they do not, Your Honor. They, again, rely on the district court's determination that it was reasonable for our officers to believe, again, with the litany of reasons that the district court gave, relating all the way back to the 12 calls that were made, the initial investigation of plaintiff's residence early in the morning, her profanity, her hostility, and her erratic behavior after demanding an officer's response, that all of those circumstances which the district court had determined gave our officers reason to believe. Who says her behavior was erratic? That is found as— Who presented evidence, any evidence that her behavior was erratic? Our officers did. Also, the— And so the district court found that that's your client's version of the events. But the district court also held that our client's belief that the plaintiff presented a danger to herself or others, those are factual circumstances. The district court denied summary judgment on your qualified immunity motion. Right. On the ground that there are factual disputes that prevent the resolution of that question. Given that decision that there are factual disputes, how do we have jurisdiction to hear your appeal at this point? Because, again, we're still even accepting plaintiff's facts. She admits that she made the calls to the 911 system. She admits that she used profanity. She admits that she was upset and that she was using profanity towards the officers both during the calls and when they arrived on scene. And taking all of those admissions, that's where the court made those determinations. So you're now on appeal saying that you're accepting all of the facts as admitted or as stated by the plaintiff here and you should still prevail. Yes, Your Honor. Okay. So let me just turn a little bit to the excessive force claim because your answer troubles me in candor. I thought that you were asking us to review the excessive force issue as a standalone issue without reference to the exigency of the circumstances, the unlawful entry issue, or any other issue, right? Yes, Your Honor. We did ask for the – in our briefing, as I said, and we'll stand on that as far as the excessive force issue. Well, that's not what you just told us a few minutes ago. So with respect to the force and in particular, as Judge Lee pointed out, with respect to the injuries that Ms. Bowell is apparently sustained, what are we to make of that? And determining whether the force used here based on undisputed facts was excessive or not. Yes, Your Honor. I think, again, that we have to look at what plaintiff has alleged, that the officers stepped into the home, that they grabbed her, that they pulled her out of the home, and she hit into the doorway and suffered a concussion and the fracture at that time. And I think we have to look at the force that was used and whether at that moment it was reasonable for the officers to believe they needed to use a certain amount of force in order to detain the plaintiff at that time. Now, the video doesn't really show the actual – whatever it was – pulling her off the banister. Is that right? The court determined that it was not clear enough to rely on as far as that use of force. So what are you relying on? We're, again, relying on the plaintiff's statement that she was taken from the home and that they pulled her out of the home at that time and relying on those facts as set forth by the plaintiff, given what the officers knew at the time of that use of force, we argue that it was reasonable under the circumstances, Your Honor. And you don't dispute that there was an actual injury? At this time, we're stuck with plaintiff's version that there was an injury. We cannot dispute that at this time, Your Honor. Thank you. Thank you. Ms. Powell, you have five minutes. Good morning, Your Honors. My name is Newell Powell, and I'm representing myself. As I stated in my brief, Your Honors, I believe that this court does not have appellate jurisdiction to hear the district court's denial of qualified immunity. Specifically, the district court made a number of findings which set forth the disputed facts. While Mr. Glass stood up here and said that he accepted my version of the facts as presented to the district court, I'm going to say it in the nicest way possible, Your Honors. He just lied to all of you. My version of the facts set forth in a signed affidavit, a sworn affidavit, and in two depositions, seven hours long each, are as follows. I called 911, I believe it was six times, and I called the local police number as instructed an additional five times. The purpose of the 911 calls was that there was a fear, I feared, an imminent home invasion. There was someone driving back and forth in front of my home. I attempted to describe to the police what was going on. I informed them that I was alone at home with my child. My husband was at work. They repeatedly hung up on those phone calls. And during the course of discovery, it was found that the police actually discussed amongst themselves after the very first call that they felt that I was harassing them and I was going to make them come to my home and, in their words, pinch me. Your Honors, an additional fact before I continue with this is that literally within days of my phone calls, there was a home invasion. A woman who was alone in her home was attacked and there was a robbery that occurred literally seven minutes away from my home. That person was arrested and is sitting in prison right now. I will continue with the rest of the facts, Your Honor. May I ask you a question, Ms. Powell? Certainly. So, in connection with the moment of your arrest, you said in your deposition that you were holding on to the banister, the staircase banister. Is that right? At the moment, Your Honor, just to create the accurate picture, I was within my home. I opened the doorway a little bit. I and my son were standing within our home at all times. I understand that, yes. When I asked the police officers for their names, they refused to give their names, and I exclaimed to them loudly, and yes, I was upset. I said, I'm going to make a complaint about you guys. You guys are doing nothing about what I'm telling you is going on here. Immediately, they pushed open the door, causing me to fall backwards against the banister, which I clutched. One of them grabbed me. I don't know if it was one or more of them, but they grabbed me and dragged me out of the house. So, you were holding on to the banister and then they dragged you? Correct, Your Honor. Were you standing up? When you say dragged you, were you still standing up? I was partially standing up because I had been pushed by the force of the door being pushed open. I was against the banister, and I was holding it to support myself. They grabbed me and slammed me against the door jamb, fracturing my clavicle, causing a concussion, and I required medical treatment for that. I did recover, Your Honor. It was a lengthy recovery, but I did recover from that. Should I go on, Your Honor? Sure. Does that answer? Okay. One of the factors that Mr. Glass did not mention is that immediately after they arrived at the scene, one of the police officers stated that they were there for a religion complaint. Now, what that means is unclear, but they were clearly there for a motivation other than what they claim now, which is their claim of the existence of exigent circumstances. The second part of it is, Your Honor, after they pulled me out of the home, placed the handcuffs, pushed me into the police car, brought me out again, did their second pat down, they left my son, who was four years old at the time, running around barefoot, crying between cars at the scene. There was no demonstration that they cared the least bit about the well-being of the child. I saw that, and that is when I started yelling for help for myself and my son, and that's clearly seen on the video. It's not something that I'm saying now. It is on the video. That is the first time that I actually started yelling for help for me and my child. I continued to see him running around unattended, and I kept yelling and asking them, where is my son? Where is my son? I want to see him. Mr. Glass has conveniently omitted that information. After I was placed in the police car, they sat there for 30 minutes discussing amongst each other, calling their police supervisor and telling him that they had toughed me up like they were going to arrest me, and that is also on the recording, which the defendants have conveniently submitted under seal, which I do not believe should be under seal because it shows exactly their state of mind at that point in time. They were there to teach me a lesson for cursing, and I admit that I used profanity. I said the F word. I believe it was twice on the phone call. When they tried to arrest you, and this is in the record, but I just want to get a sense, in your home. I just want to go back to that moment again. Did you try to stop them from handcuffing your pony? Not really, Your Honor. You say not really. I actually walked out with them, and I'm asking one of them. Well, when you say not really at the time, you were really not in a bad state. I did not resist at all. There were three of them. They immediately grabbed me, slammed me on the door. They placed the handcuffs, and I asked them, why are you arresting me? Why are you doing this? One of them said, I believe it was Smaldone, he said, we told you to stop calling. That was his statement at the time. No reasonable police officer would undertake a warrantless entry into a home. There were no exigent circumstances. The only complaint that I was calling the police for was an imminent break-in into my home, which is what I was concerned about. I was not calling because I was concerned that someone was going to harm me inside my home. I was calling because there was a car driving back and forth, and the police were doing nothing about it. So, Ms. Powell, we've kept you well past your time. Thank you. Thank you. We're going to reserve decision, so you'll hear from us at some point with the decision.